# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**BROWN & ROOT INDUSTRIAL SERVICES, LLC, et al.**

**VERSUS**

**JAESON M. BROWN, et al.**

**CIVIL ACTION**

**NO. 21-291-JWD-SDJ**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law, and recommendations therein.  Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on September 9, 2022.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**BROWN & ROOT INDUSTRIAL**                    CIVIL ACTION
**SERVICES, LLC, et al.**

**VERSUS**

                                                NO. 21-291-JWD-SDJ

**JAESON M. BROWN, et al.**

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Before the Court is a motion styled "Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6), Motion to Dismiss Pursuant to 28 U.S.C. § 1367, and Alternatively, Motion to Stay Under *Colorado River* Abstention" ("Motion to Dismiss") (R. Doc. 35), filed by Defendants Jaeson M. Brown, Daniel G. Farris, Michael P. Farris, Jeffrey M. Hebert, Robert A. "Tony" Huval, Mitchell L. Morgan, David E. Sterken, Anthony E. "Andy" Farris, Jr., Kevin D. Steed, and Fides Consulting, LLC.[1]  Plaintiffs Brown & Root Industrial Services, LLC ("BRIS"), and BRIS Engineering, LLC, oppose Defendants' Motion to Dismiss (R. Doc. 43).  Defendants filed a Reply to Plaintiffs' Opposition (R. Doc. 44).  Defendants also filed a Supplemental Memorandum in Support of their Motion to Dismiss (R. Doc. 47), to which Plaintiffs have filed an Opposition (R. Doc. 51).  Finding oral argument not necessary and considering the Parties' arguments, the facts alleged, and the applicable, law, it is recommended that Defendants' Motion to Dismiss (R. Doc. 35) be **DENIED**.

---

[1] Defendants filed a separate Memorandum in Support of their Motion to Dismiss (R. Doc. 39).

## I.    FACTUAL BACKGROUND

Plaintiff BRIS first filed suit on May 18, 2021, naming as Defendants Brown, D. Farris, M. Farris, Hebert, Huval, Morgan, and Sterken.[2]  On September 27, 2021, an Amended Complaint was filed (R. Doc. 24), adding BRIS Engineering as a Plaintiff and adding A. Farris, Steed, and Fides as Defendants.  The following are facts alleged by Plaintiffs in their Amended Complaint.

BRIS is an industrial services company "provid[ing] the full range of industrial services—engineering, construction, EPC, maintenance, and specialty services—to chemical/petrochemical, refining, and other plant sites and facilities."[3]  In 2015 BRIS acquired Wink Engineering "in order to add engineering services, designing, surveying, and EPC to its portfolio of services."[4]  At some time thereafter, BRIS formed BRIS Engineering as a wholly-owned subsidiary of BRIS, with BRIS as the sole member and sole equity owner of BRIS Engineering, a limited liability company.[5]

In April 2020 and June 2020, Defendant A. Farris and "senior officials" of CSRS, Inc., met with "senior officials" of Fidelis Infrastructure, LP, "to discuss a potential engineering project for a renewable fuels facility at the Port of Greater Baton Rouge."[6]  On November 10, 2020, Grön Fuels, LLC, in which Fidelis has an ownership interest, announced "plans to conduct a feasibility study for building a renewable fuel complex at the Port of Greater Baton Rouge."[7]  Soon thereafter, on November 18, 2020, A. Farris, along with several employees and officers of CSRS, created Fides Consulting, LLC, made Defendant herein.[8]

---

[2] R. Doc. 1 at 1-2 ¶¶ 1-8.
[3] R. Doc. 24 at 3 ¶ 16.
[4] *Id.* ¶ 17.
[5] *Id.* ¶¶ 19-20.
[6] *Id.* at 11 ¶ 47.
[7] *Id.* ¶¶ 48-49.
[8] *Id.* ¶ 50.

Fides provides engineering services similar to those offered by BRIS.[9]  Fides has been awarded a contract to perform a feasibility study related to the Grön Fuels project at the Port of Greater Baton Rouge.[10]  Subsequent to the inception of Fides, both high-level officials at BRIS and "key" employees of BRIS Engineering left Plaintiffs to go work at Fides, a brief explanation of which follows.

Prior to creating Fides, A. Farris, who initially served as Chief Executive Officer of Wink Engineering and then of BRIS Engineering, served as Executive Vice President of Strategic Accounts for BRIS.[11]  A. Farris resigned from BRIS on November 2, 2020, becoming President of Fides shortly thereafter, on November 18, 2020.[12]

Steed, who had worked at Wink Engineering and then at BRIS Engineering since 2001, eventually became President of BRIS Engineering.[13]  He "ended his employment with Plaintiffs on October 16, 2020," later becoming Vice President of Fides on November 18, 2020.[14]

Huval began working for Wink Engineering in 2005, later working at BRIS Engineering as its Vice President/General Manager from 2016 to 2019 before becoming a Senior Consultant there.[15]  Huval ended his employment at BRIS Engineering on November 13, 2020.[16]  He began working at Fides on January 30, 2021, as a Senior Project Manager.[17]

---

[9] *Id.* ¶ 52.
[10] *Id.* ¶ 54.
[11] *Id.* at 6 ¶ 31.
[12] *Id.* at 7, 8  ¶¶ 35, 37.
[13] *Id.* at 8  ¶ 38.
[14] *Id.* at 9, 10  ¶¶ 41, 45.
[15] *Id.*  at 12 ¶ 58.
[16] *Id.* ¶ 61.
[17] *Id.* ¶ 62.

Having worked at Wink Engineering since 2001, Hebert most recently worked as a Piping Design Manager for BRIS Engineering.[18]  Hebert resigned from BRIS Engineering on February 12, 2021.[19]  Hebert then began working as the Piping Design Manager at Fides on February 15, 2021.[20]

Brown also began working at Wink Engineering in 2001.[21]  He stayed on with BRIS Engineering, working most recently as a Project Controls Manager.[22]  Brown resigned from BRIS Engineering on February 19, 2021, and began working at Fides as its Project Controls Manager on February 22, 2021.[23]

Sterken began working at Wink Engineering in 2011, working most recently for BRIS Engineering as an E&I Manager.[24]  Sterken resigned from BRIS Engineering on February 19, 2021, and began working at Fides as Electrical Engineering Manager shortly thereafter on February 22, 2021.[25]

Morgan also previously worked at Wink Engineering, beginning there in 2004.[26]  He later worked for BRIS Engineering, most recently as a Project Management Manager.[27]  Morgan resigned from BRIS Engineering in late February 2021.[28]  He began working as a Mechanical Engineering Manager at Fides on February 22, 2021.[29]

---

[18] *Id.* at 14 ¶ 67.
[19] *Id.* at 14-15 ¶ 70.
[20] *Id.* at 15 ¶ 71.
[21] *Id.* at 19 ¶ 77.
[22] *Id.*
[23] *Id.* ¶¶ 80-81.
[24] *Id.* at 23 ¶ 86.
[25] *Id.* ¶¶ 89-90.
[26] *Id.* at 28 ¶ 95.
[27] *Id.*
[28] *Id.* at 29 ¶ 98.
[29] *Id.* ¶ 99.

D. Farris, like many other Defendants, initially worked for Wink Engineering, beginning there in August 2009.[30]  He then worked for BRIS Engineering, most recently as a Project Management Coordinator II.[31]  D. Farris resigned from BRIS Engineering on February 12, 2021, beginning work at Fides as Document Manager on March 1, 2021.[32]

And finally, M. Farris also initially worked for Wink Engineering, starting there in August 2009.[33]  He subsequently worked for BRIS Engineering, most recently as Procurement Manager.[34]  He resigned from BRIS Engineering on October 15, 2020.[35]  On March 1, 2021, he began working at Fides as Procurement Manager.[36]

## II.    PROCEDURAL HISTORY

Before filing the instant suit, BRIS filed suit in state court on March 2, 2021, against three Defendants, A. Farris, Steed, and Fides, asserting various state law claims.[37]  BRIS subsequently amended its state-court petition,  expanding its claims to include alleged violations of the Louisiana Uniform Trade Secrets Act ("LUTSA") and the Louisiana Unfair Trade Practices Act ("LUTPA") and adding as defendants all those Defendants named herein, with the exception of D. Farris and M. Farris.[38]  This case remains pending in state court.

Plaintiffs then filed the instant litigation on May 18, 2021.[39]  In response, on July 19, 2021, Defendants filed a Motion similar to the instant Motion to Dismiss, seeking dismissal pursuant to Rule 12(b)(6) or, alternatively, dismissal pursuant to 28 U.S.C. § 1367, as well as seeking to stay

---

[30] *Id.* at 31 ¶ 105.
[31] *Id.*
[32] *Id.* at 32 ¶¶ 108-109.
[33] *Id.* at 33 ¶ 111.
[34] *Id.*
[35] *Id.* at 34 ¶ 114.
[36] *Id.* ¶ 115.
[37] R. Doc. 39 at 1.
[38] *Id.*; R. Doc. 35-2.
[39] R. Doc. 1.

the proceedings under the *Colorado River* abstention doctrine.[40]  The Court, on August 20, 2021, denied that Motion without prejudice, giving BRIS "an opportunity to cure the purported pleading defects" by filing an Amended Complaint.[41]

BRIS, now with BRIS Engineering, filed an Amended Complaint on September 27, 2021, which is now the operative pleading in this case.[42]  On October 29, 2021, Defendants filed the instant Motion to Dismiss.[43]  Plaintiffs filed their Opposition thereto on November 22, 2021.[44] Defendants then filed a Reply in support of their Motion to Dismiss on December 3, 2021.[45]  Then, on March 16, 2022, and with leave of Court, Defendants filed a Supplemental Memorandum in Support of their Motion to Dismiss, in which Defendants "update the Court on the status of the … discovery efforts in the state court proceeding."[46]  Plaintiffs, with leave of Court, filed an Opposition to this Supplemental Memorandum on May 19, 2022.[47]  Defendants also filed a Motion for Oral Argument on their Motion to Dismiss, which the District Judge recently denied on August 29, 2022.[48]

## III.    STANDARD OF REVIEW

Defendants' Motion to Dismiss seeks dismissal of Plaintiffs' claims "for misappropriation and conspiracy to misappropriate trade secrets under the Defend Trade Secrets Act" pursuant to Federal Rule of Civil Procedure 12(b)(6).[49]  Rule 12(b)(6) specifically allows for such a motion to dismiss based on a party's "failure to state a claim upon which relief can be granted."  A Rule

---

[40] R. Doc. 10.
[41] R. Doc. 22 at 2.
[42] R. Doc. 24.
[43] R. Doc. 35.
[44] R. Doc. 43.
[45] R. Doc. 44.
[46] R. Doc. 47 at 1.
[47] R. Doc. 51.
[48] R. Doc. 52; R. Doc. 54.
[49] R. Doc. 35 at 1.

12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a Rule 12(b)(6) motion, a pleading's language must, on its face, demonstrate that there exists plausibility for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In determining whether it is plausible that a pleader is entitled to relief, a court does not assume the truth of conclusory statements, but rather looks for facts which support the elements of the pleader's claim. *Twombly*, 550 U.S. at 557. Factual assertions are presumed to be true, but "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" alone are not enough to withstand a 12(b)(6) motion. *Iqbal*, 556 U.S. at 678. Rather, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). Thus, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

## IV.    DISCUSSION

In their Motion to Dismiss, Defendants seek dismissal of Plaintiffs' federal law claims for misappropriation and conspiracy to misappropriate trade secrets under the DTSA.[50]  If those claims are dismissed, Defendants ask the Court to decline exercising supplemental jurisdiction over any remaining state law claims pursuant to 28 U.S.C. § 1367.[51]  Alternatively, if Plaintiff's DTSA claims are not dismissed, Defendants request that the Court stay this case pursuant to the *Colorado River* abstention doctrine.[52]  Beginning with Defendants' request for dismissal of Plaintiffs' federal DTSA claims, the Court addresses each of these arguments, in turn, below.

### A.    Misappropriation of Trade Secrets Under the DTSA

The DTSA grants the "owner of a trade secret that is misappropriated" the right to bring a civil action "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  To state a claim under the DTSA, a plaintiff must allege: (1) it owns a trade secret, (2) the trade secret was misappropriated by the defendants, and (3) the trade secret is related to a product or service used or intended for use in interstate or foreign commerce.  *Am. Biocarbon, LLC v. Keating*, No. 20-259, 2020 WL 7264459, at *3 (M.D. La. Dec. 10, 2020).

Here, Defendants argue that Plaintiffs have failed both to identify any trade secrets with sufficient particularity and to allege misappropriation of any trade secrets.[53]  Defendants then claim that BRIS is not actually the owner of any trade secrets, so it cannot recover for any misappropriation thereof.[54]  Finally, Defendants argue that Plaintiffs have failed to take reasonable

---

[50] R. Doc. 35 at 1.
[51] *Id.* at 2.
[52] *Id.*
[53] R. Doc. 39 at 3-15.
[54] *Id.* at 15-16.

steps to maintain the secrecy of any alleged trade secrets, a requirement for recovery under the DTSA.[55]  Thus, per Defendants, Plaintiffs have failed to state a claim for violation of the DTSA.

In response, Plaintiffs assert that they have alleged a viable claim under the DTSA "by identifying specific trade secrets misappropriated by each Defendant and owned by the Plaintiffs."[56]  Further, per Plaintiffs, abstention is unwarranted not only because the state court proceeding is not parallel to the instant litigation, but also because the *Colorado River* abstention factors weigh against abstention.[57]  Plaintiffs also argue that the Court may exercise supplemental jurisdiction over the state law claims "because they are so related to the federal claims."[58]  Finally, Plaintiffs argue that "because Defendants do not challenge the sufficiency of the alleged state law claims, or the federal civil conspiracy claim under the DTSA, these viable claims defeat any motion to dismiss and/or stay."[59]

### 1.    Existence of a Trade Secret

In stating a claim under the DTSA, Plaintiffs must first allege the existence of a "trade secret" as that term is defined by the DTSA.  The DTSA defines the term "trade secret" to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

---

[55] *Id.* at 17-20.
[56] R. Doc. 43 at 2.
[57] *Id.*
[58] *Id.*
[59] *Id.*

> through proper means by, another person who can obtain economic value
> from the disclosure or use of the information.

18 U.S.C. § 1839(3). Thus, per this definition, Plaintiffs must allege that they have taken reasonable measures to keep the information secret and that the information has independent economic value from not being generally known or readily ascertainable. Additionally, "despite this broad definition, plaintiffs pursuing DTSA claims must put a finer point on their allegations." *Am. Biocarbon*, 2020 WL 7264459, at *4. "Specifically, to allege a trade secret, the plaintiff must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Id.* (quoting *Navigation Holdings, LLC v. Molavi*, 445 F.Supp.3d 69, 75 (N.D. Cal. 2020)).

### a.    Whether Plaintiffs describe the trade secrets with sufficient particularity

Plaintiffs bear the burden of identifying the trade secrets and showing that they exist. *SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20-2970, 2021 WL 4460522, at *9 (E.D. La. Sept. 29, 2021) (citing *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2019 WL 4752058, at *5 (E.D. La. Sept. 30, 2019)). "This requires that the plaintiff 'clearly refer to tangible trade secret material' rather than a 'system which potentially qualifies for trade secret protection.'" *Id.* at *10 (quoting *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)). "'Catchall' phrases or mere 'categories' of trade secrets are inadequate." *Id.* (quoting *InteliClear*, 978 F.3d at 658). "However, the Fifth Circuit has never required that trade secrets 'be pled with extreme specificity.'" *Id.* (quoting *C&M Oilfield Rentals, LLC v. Location Illuminator Techs., LLC*, No. 18-39, 2020 WL 5745833, at *6 (W.D. Tex. Aug. 3, 2020)).

In their Amended Complaint, Plaintiffs list both the categories of alleged trade secrets taken as well as list the actual files and documents allegedly taken by the individual Defendants.

Plaintiffs also list the external USB devices each Defendant connected to Plaintiffs' "protected computers" prior to their departure from BRIS and BRIS Engineering. For example, for A. Farris, the President of Fides, Plaintiffs allege that "a forensic review of the protected computer used by A. Farris prior to his separation from Plaintiffs .... indicated that hundreds of Plaintiffs' trade secrets and confidential information related to manpower, proposals, estimates, budgets, and reforecasts were accessed and copied from A. Farris's protected computers onto external thumb drives."[60] Plaintiffs then list 17 specific documents allegedly copied by A. Farris, including files titled "Estimating Deliverables Matrix 0," "Cost Estimate Check Sheet," "Procurement Cardinal Rules," "Project Estimate Recap – (Rubicon EPC)," and "2020 Markup Breakdown," to name a few.[61]

For Steed, the Vice President of Fides, Plaintiffs list the four specific USB devices that Steed connected to his protected BRIS Engineering computer, including the dates said devices were last connected.[62] As with A. Farris, Plaintiffs allege that Steed accessed and copied "thousands of Plaintiffs' trade secrets and confidential information related to manpower, proposals, estimates, budgets, and reforecasts."[63] Plaintiffs then list the 33 specific documents allegedly copied by Steed, which include, *inter alia*, "2021 Budget Draft 1 PLANB," "BR Corporate Rerate cost," "Process Scope and Clarifications," "Engineering Q1 Financial Review Powerpoint," "Active Employees w_Date of Last Increase – for Kevin 02 05 19," and "Copy of 2020 June Reforecast Final."[64] Finally, Plaintiffs list five specific files containing "confidential

---

[60] R. Doc. 24 at 7 ¶ 36.
[61] *Id.* at 7-8 ¶ 36.
[62] *Id.* at 9  ¶ 42.
[63] *Id.* ¶ 43.
[64] *Id.* at 9-10 ¶ 43.

information and trade secrets related to renewable fuels proposals and contracts" that Steed "accessed and/or copied."[65]

Similarly, for former BRIS Engineering employee Morgan, Plaintiffs claim that "as Project Management Manager, Morgan was considered a Department Head and had access to Plaintiffs' confidential and proprietary information including customer information, customer contact information, pricing, customer proposals, engineering estimates, personnel rosters, engineering procedures, personnel policies, engineering rates, and engineering models, among other things."[66] Plaintiffs then list three specific USB devices that Morgan connected to his protected computer while at BRIS Engineering.[67]    Next, Plaintiffs claim that the forensic review conducted of Morgan's computer after his departure from BRIS Engineering "indicated that thousands of Plaintiffs' trade secrets and confidential information related to manpower, estimates, projects and proposals" were copied by Morgan, including 32 "complete client files copied on his last day with BRIS Engineering," which files then are specifically listed.[68]    Plaintiffs then list three "confidential and trade secret proposals" Morgan allegedly accessed and copied, which appear to be the files for engineering proposals for the years 2019 through 2021.[69]    Per Plaintiffs "[t]hese folders contain all of the client proposals Plaintiffs worked on and submitted over the last three years," and said "files contain estimates, execution strategies, client contacts, commercials terms, rates, etc. that are extremely confidential and crucial to Plaintiffs' business operations."[70]    Plaintiffs also list 12 "confidential folders" Morgan "accessed/copied," which include, *inter alia*, "Best Practices"

---

[65] *Id.* at 10 ¶ 44.
[66] R. Doc. 24 at 28 ¶ 96.
[67] *Id.* at 29 ¶ 100.
[68] *Id.* at 29-30 ¶ 101.
[69] *Id.* at 30 ¶ 102.
[70] *Id.*

guidelines that are "proprietary property, constituting trade secrets."[71]  Finally, Plaintiffs claim Morgan "copied 153 files related to all of Plaintiffs' current rate schedules."[72]

Given the extensive allegations for each Defendant, the Court will not include all of them here, instead providing these three as representative examples.[73]  The Court finds, however, that they demonstrate that Plaintiffs have identified the trade secrets with sufficient particularity to continue their claim of misappropriation thereof under the DTSA.  As this Court previously has determined, "[c]ustomer lists, pricing data, and contractual terms all fall within the types of information regularly considered to be trade secrets under [the] DTSA …"  *Brock Services, LLC*, 2019 WL 9096410, at *6; *see also Complete Logistical Servs. v. Rulh,* 350 F.Supp.3d 512, 518 (E.D. La. 2018) (concluding that federal courts within the Fifth Circuit regularly hold that customer lists may be considered a trade secret); *Alfasigma USA, Inc. v. EBM Med., LLC,* No. 17-7753, 2018 WL 1604961, at *3 (E.D. La. April 3, 2018) (finding that customer lists and marketing information, among other things, were sufficient to meet the definition of a trade secret).  As these types of documents are included in the lists provided by Plaintiffs, and construing the facts in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have described the trade secrets with sufficient particularity to state a claim under the DTSA.  *See Computer Scis. Corp. v. Tata Consultancy Servs. Ltd.*, No. 19-970, 2020 WL 2487057, at *4 (N.D. Tex. Feb. 7, 2020) (finding plaintiff's allegations that its software, source code, "ROR calculation," and user manuals are trade secrets were sufficiently specific); *Rulh*, 350 F.Supp.3d at 518, 519 (finding allegations that

---

[71] *Id.* at 31 ¶ 102.

[72] *Id.*

[73] The Court notes that these are not even the most egregious alleged offenders.  With regard to Huval, Plaintiffs list 35 specific files that he allegedly copied prior to his departure from BRIS Engineering.  *Id.* at 13-14 ¶ 64.  For Hebert, Plaintiffs allege he accessed and copied 11 listed "confidential proposals," as well as 56 listed folders.  *Id.* at 15-17 ¶ 73.  Plaintiffs further allege that Hebert emailed certain "confidential information and trade secrets" to his personal email address, listing 41 specific files Hebert allegedly so misappropriated.  *Id.* at 18-19 ¶ 74.  Plaintiffs allege Brown copied over 80 specific, listed files.  *Id.* at 20-23 ¶ 83.  And for Sterken, Plaintiffs allege he copied 55 specific files. *Id.* at 24-28 ¶ 92.

"Defendant took profit and loss statements, customer lists, and sales analyses without authorization" sufficient under the DTSA to allege existence of trade secrets).

In making this determination, the Court rejects Defendants' argument that Plaintiffs have made an "amorphous and categorical attempt to broadly and ambiguously identify an *unlimited* number of trade secrets for its DTSA claim."[74]  Defendants argue that Plaintiffs' listing of various file names and folders is not sufficient because individual trade secrets were not specified.[75]  In support, Defendants cite to this Court's holding in *American Biocarbon, LLC v. Keating*, *supra*. In *American Biocarbon*, this Court dismissed the plaintiff's DTSA claims, finding that the plaintiff had made only "conclusory allegations" that fell short of "the particularity standard necessary to separate its alleged trade secret(s) from matters of general knowledge in the … industry …"  2020 WL 7264459, at *5.  However, in *American Biocarbon*, as opposed to the instant litigation, the complaint there listed the "confidential information and trade secrets" to include "without limitation":

> studies; know how; scientific research; product research; product testing and results; product development research; market research and strategies; prospective client lists; client research; plant designs; plant site research; process designs; company financial information such as costs, profits, assets and liabilities; any confidential information related to the manufacture, composition, marketing, *or* processing, of white pellets, bagasse pellets, *or* sugar cane wastes; organizational structure; information pertaining to off-take agreements developed by or for [plaintiff].

*Id.* at *4 (emphasis in original).  The Court found these claims "vague and unbounded" and encompass "every aspect of the bagasse pellets industry."  *Id.*  Such is not the case here, where Plaintiffs have provided multiple lists of specific files and documents that have been taken, including, for example, confidential proposals for certain clients, current and pending contracts

---

[74] R. Doc. 39 at 4 (emphasis in original).
[75] *Id.* at 5.

and proposals related to renewable fuels, specific client files, meeting minutes and progress reports, budget reports, and project studies.[76]  Such allegations are not vague and unbounded, and while Plaintiffs, in their Amended Complaint, do not allege that they list every single document containing a trade secret allegedly misappropriated by Defendants, Defendants cite to no case law, and the Court knows of none, placing such a burden on Plaintiffs at the beginning of this litigation.

Rather, instead of following *American Biocarbon*, the Court finds this case more similar to the *Brock Services, LLC v. Rogillio* case, No. 18-867, 2019 WL 9096410 (M.D. La. June 17, 2019). In *Brock Services*, the Court described the plaintiff's allegations as follows:

> In the Second Amended Complaint, Brock alleged that each employee defendant had access to certain categories of confidential information by virtue of their job functions and responsibilities.  Brock also listed specific folders and files containing confidential information purported to have been taken by [individual defendants].  And Brock alleged that each of the employee defendants misappropriated—by either deleting, copying, or stealing—its "customer list, pricing, contractual terms, and other documents."

2019 WL 9096410, at *7 (internal citations omitted).  The Court continued that, "[c]onstruing the facts in the light most favorable to Brock, the Court concludes that Brock has sufficiently alleged the existence of a trade secret."  *Id.*  With quite similar allegations here, the Court finds its prior ruling both instructive and precedential.  This further supports the Court's finding that Plaintiffs have described their trade secrets with sufficient particularity to state a claim under the DTSA.

> **b.  Whether Plaintiffs took reasonable measures to keep the information secret**

As stated above, to qualify as a trade secret under the DTSA, Plaintiffs must demonstrate that they have taken reasonable measures to keep the information secret.  As argued by Defendants, Plaintiffs have failed to do so.  In support of their position, Defendants argue that BRIS is

---

[76] *See* R. Doc. 24 at 10 ¶ 44, 13-14 ¶ 64, 15 ¶ 73, 18-19 ¶ 74, 20-22 ¶ 83, and 25-27 ¶ 92.

improperly seeking to adopt the BRIS Engineering Handbook.[77]  Defendants continue that none of Plaintiffs' company policies either define "trade secrets" or identify information "designated as confidential."[78]  They also argue that the "confidential information" described in the Employee Handbook is inconsistent with the categories of trade secrets alleged in Plaintiffs' Amended Complaint and includes information owned by third parties.[79]  Finally, they claim that Plaintiffs' company policies did not create any contractual obligations with their employees.[80]

As previously acknowledged by this Court, "[t]he efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets." *Brock Servs., LLC*, 2019 WL 9096410, at *6 (quoting *Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179, 183 (5th Cir. 1988)).  As alleged by Plaintiffs in their Amended Complaint, BRIS, as the parent company, provides general employment policies for its wholly-owned subsidiaries, including a code of conduct and ethics and technology policies.[81]  In addition, BRIS "adopts all policies, procedures, handbooks, and guidelines of its wholly owned subsidiary as if these policies, procedures, handbooks, and guidelines are part and parcel of BRIS."[82]  With regard to the steps taken to keep information confidential, Plaintiffs assert that they "only share certain proposals, rate information, personnel information, or customer information with employees who have a need to know the information to perform their jobs and who have attained a specific management level within the company," with access being granted to these individuals by Plaintiffs' IT Department.[83]  Other measures taken by Plaintiffs to keep their information secret include

---

[77] R. Doc. 39 at 17.
[78] *Id.* at 17-18.
[79] *Id.* at 18-19.
[80] *Id.* at 20.
[81] R. Doc. 24 at 3-4 ¶ 21.
[82] *Id.* at 4 ¶ 23.
[83] *Id.* at 5 ¶ 27.

implementing company-wide policies and procedures governing the use and disclosure of trade secret information, using password protections including changing passwords periodically, requiring remote access to Plaintiffs' databases only through Plaintiffs' virtual private network, encrypting electronic mail to protect confidential information, requiring any data saved to Plaintiffs' devices or any other device while disconnected from Plaintiffs' network to be immediately copied and/or synchronized to Plaintiffs' network, notifying all uses/employees that all computers, computer files, e-mail system, software, and other technological resources are Plaintiffs' property and for the sole purpose of conducting Plaintiffs' business, and restricting access to certain trade secret information based upon an employee's role with the Plaintiffs.[84]

Plaintiffs further allege that they have implemented policies in a Code of Business Conduct and an Employee Handbook prohibiting disclosure of confidential and trade secret information.[85] Plaintiffs continue, asserting that the BRIS Code of Conduct, which also applies to BRIS Engineering employees, contains a "Confidential and Proprietary Information" Policy which prohibits an employee "entrusted with or otherwise knowledgeable about information of a confidential or proprietary nature" to disclose or use that information outside the company, including after employment with BRIS Engineering has ended, without proper written authorization.[86] Similarly, the BRIS Engineering Employee Handbook contains a policy titled "Confidential Nature of Business Affairs," which identifies the "internal affairs of BRIS, as well as the Company's technical work product" as "confidential information."[87] This Handbook also contains a non-exhaustive list of information considered confidential and mandates that such information "not be discussed with anyone outside the organization and should only be discussed within the organization on a 'need to know' basis."[88]

---

[84] *Id.* at 37 ¶ 125.
[85] *Id.* at 5 ¶ 27.
[86] *Id.* ¶ 28.
[87] *Id.* ¶ 29.
[88] *Id.* at 5-6 ¶ 29.  The non-exhaustive list provided includes "…compensation data; computer processes; … customer lists; customer preferences; engineering drawings, studies, reports, evaluations, cost estimates, opinions, and technical work product; financial information; … pending projects and proposals; … proprietary production processes; research and development strategies; surveys, evaluations, reports, measurements, opinions, field notes, and technical survey work product."  *Id.* at 6 ¶ 29.

In addition to the Code of Conduct and Handbook, all BRIS and BRIS Engineering employees receive a Company Data and Technology Assets (Reasonable Care) Policy, an Email Acceptable Use Policy, and an Internet Acceptable Policy, all of which state that all data created, stored, or transmitted via BRIS technology resources, including documents and email messages, are and will remain BRIS property and may not be sold, transmitted, conveyed, or communicated to anyone outside of BRIS without "express management authorization."[89]  The Court finds that, based on these allegations and construing them in a light most favorable to Plaintiffs, Plaintiffs have sufficiently alleged that they have taken reasonable measures to preserve the secrecy of their trade secrets and confidential information.  *See Volt Power, LLC v. Deville*, No. 21-395, 2022 WL 70125, at *3 (W.D. La. Jan. 6, 2022) (finding defendant took reasonable measure to protect trade secrets by restricting access, enabling password protections, and requiring employees to agree to comply with its "Code of Business Conduct" which contained non-disclosure provisions); *Centurum Info. Tech. Inc. v. Geocent, LLC*, No. 21-82, 2021 WL 533707, at *13 (E.D. La. Feb. 12, 2021) (concluding plaintiff took reasonable measures to keep secret its proprietary information "through company policies, password protection and multi-factor authentication, restricted access, and other means"); *Windsor v. Olson*, No. 16-934, 2019 WL 2080021, at **17-18 (N.D. Tex. May 10, 2019) (finding defendant took reasonable measures to maintain the secrecy of its trade secrets by maintaining it on a password-protected computer system, limiting its access to certain personnel, and implementing written employment policies governing access to and use of confidential information).

---

[89] *Id.* ¶ 30.

Turning to the arguments raised by Defendants in their Motion to Dismiss, Defendants first argue that BRIS improperly seeks to adopt the BRIS Engineering Employee Handbook. While the Court at this point declines to make a determination as to whether BRIS is bound by the BRIS Engineering Handbook, that decision does not affect the Court's finding that reasonable measures have been taken. First, the majority of named Defendants herein were BRIS Engineering employees, so it applied to them. Second, BRIS also had other, additional policies in place to protect its information. The Court, therefore, finds this argument without merit.

The same finding applies to Defendants' argument that none of Plaintiffs' company policies either define "trade secrets" or identify information "designated as confidential." Defendants admit that BRIS Engineering's Handbook "offers illustrative examples of broad categories of information that may be considered 'confidential information.'"[90] However, they focus on language in the policy that such information be "designated as confidential" and argue that because they have failed to identify any specific information "designated as confidential," Plaintiffs have failed to demonstrate that they have taken reasonable steps to keep such information secret.[91] The Court disagrees. The information deemed "confidential" is specifically listed in the document, as acknowledged by Defendants. Moreover, Plaintiffs have alleged that this information is confidential and/or a trade secret throughout their Amended Complaint. The Court finds this argument by Defendants specious at best.

Defendants' next arguments also are wholly without merit. As argued by Defendants, "the illustrative list of 'confidential information' described in the Employee Handbook is substantially misaligned with the categories of 'trade secret' information … described in the Amended

---

[90] R. Doc. 39 at 18.
[91] *Id.*

Complaint."[92]  Defendants argue that because certain information for which Plaintiffs seek trade secret protection is not included in this admittedly "illustrative" list, such protection should not be extended.  For example, they take umbrage with "engineering procedures" and "engineering models," neither of which are included in the list, though "engineering drawings, studies, reports, evaluations, cost estimates, opinions, and technical work product" are.[93]  The Court is not moved by this argument of semantics.

Defendants then argue that the broad description of confidential information included in the BRIS Engineering Handbook "includes information owned by third-party customers and clients."[94]  Per Defendants, "[t]his further illustrates Plaintiffs' pleading deficiencies as Plaintiffs refer to 'confidential' and 'trade secret' information interchangeably throughout the Amended Complaint."[95]  It does not.  Plaintiffs are limited here to the definition of "trade secrets" as provided by the DTSA.  Whether it is company policy to consider information to be confidential that would not fall within the statutory definition is of no consequence.

Finally, Defendants argue that Plaintiffs' company policies did not create any contractual obligations with their employees.[96]  Defendants claim that this, coupled with Plaintiffs' "fail[ure] to take any steps to ensure the protection of any information through a nondisclosure agreement or confidentiality agreement" means Plaintiffs did not take reasonable steps to protect trade secret information.[97]  As Defendants have provided no case law to indicate that such a contractual obligation is required for a finding that reasonable steps have been taken, the Court also finds this argument without merit.  *See 2999TC Acquisitions, LLC v. 2999 Turtle Creek, LLC*, No. 20-3229,

---

[92] *Id.*
[93] R. Doc. 24-2 at 9.
[94] R. Doc. 39 at 19.
[95] *Id.*
[96] *Id.* at 20.
[97] *Id.*

2021 WL 3145986, at *3 (N.D. Tex. July 6, 2021) (acknowledging that an "express contractual provision is not required to establish a duty of confidentiality" and finding plaintiffs took reasonable measures to protect confidential information by getting verbal agreements from potential investors to keep the information confidential and by storing electronic data on servers in a locked room and hard copies in locked cabinets).[98]

### c.  Whether the information has independent economic value

To establish a "trade secret" under the DTSA, in addition to demonstrating they have taken reasonable measures to keep the information secret, Plaintiffs also must show that the information has independent economic value from not being generally known or readily ascertainable. Defendants do not challenge this element in their Motion to Dismiss.  Further, Plaintiffs specifically allege in their Amended Complaint that "Plaintiffs' trade secrets derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information."[99]  Plaintiffs continue that their "trade secrets have a heightened value because of the highly-competitive and highly-regulated nature of Plaintiffs' business."[100]  As Plaintiffs have sufficiently pleaded the existence of a trade secret in their Amended Complaint, the Court now turns to whether they have alleged misappropriation of same to state a claim under the DTSA.

### 2.  Misappropriation of a Trade Secret

---

[98] Of interest, the Court notes that attached to Plaintiffs' Amended Complaint are two Employment Agreements between BRIS and Defendant A. Farris, indicating Plaintiffs had contractual relationships with at least some of its employees.  *See* R. Docs. 24-6 and 24-7.
[99] R. Doc. 24 at 37 ¶ 126.
[100] *Id.*

Under the DTSA, "[t]here are two methods of misappropriation: acquisition or disclosure/use." *Brock Servs., LLC*, 2019 WL 9096410 at *8. The DTSA defines the term "misappropriation" to mean:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

    (i) used improper means to acquire knowledge of the trade secret;

    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

        (I) derived from or through a person who had used improper means to acquire the trade secret;

        (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    (iii) before a material change of the position of the person, knew or had reason to know that—

        (I) the trade secret was a trade secret; and

        (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5). The DTSA further defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

Turning first to the question of whether trade secrets were improperly acquired, Defendants argue that Plaintiffs do not allege that Defendants acquired the information at issue here through

"improper means."[101]  Per Defendants, "Plaintiffs acknowledge that the individual Defendants were authorized to access and copy the information given their managerial level roles within the company."[102]  They continue, arguing that because they "accessed this information through lawful means during the course of their employment," Plaintiffs cannot allege misappropriation of the information.[103]

In their Amended Complaint, Plaintiffs do acknowledge that the individual Defendants had access to trade secrets and confidential information by virtue of their positions within BRIS and BRIS Engineering.[104]  However, Plaintiffs allege improper acquisition because such information was accessed and copied from the individual Defendants' "protected computers" onto external thumb drives.[105]  Moreover, Plaintiffs allege that the trade secrets were accessed and copied onto these external thumb drives just before that Defendant ended his employment with Plaintiffs and, shortly thereafter, began working at Fides.[106]  For Defendant Hebert, Plaintiffs also claim he emailed confidential information and trade secrets to his personal email address.[107]  Per Plaintiffs, Defendants "surreptitiously and improperly copied and/or stole these trade secrets by improper means and without authorization from Plaintiffs [sic] protected computers," further describing their actions as "the overt act of stealing."[108]  Plaintiffs continue in their Opposition that "[w]hile Defendants may have had *access* to confidential, proprietary and trade secret information while

---

[101] Defendants first argument is that to misappropriate a trade secret, the person must know it is a trade secret and, "[b]ased on Plaintiffs' failure to identify any trade secrets with particularity," Defendants do not have a way of knowing what is or was a trade secret.  R. Doc. 39 at 11.  Because the Court already has found that Plaintiffs have identified trade secrets with sufficient particularity, the Court finds this argument without merit.

[102] R. Doc. 39 at 11.

[103] *Id.* at 12.

[104] *See* R. Doc. 24 at 7 ¶ 34, 8-9 ¶ 40, 12 ¶ 59, 14 ¶ 68, 19 ¶ 78, 23 ¶ 87, 28 ¶ 96, 31-32 ¶ 106, and 33 ¶ 112.

[105] *Id.* at 7-8 ¶ 36, 9-10 ¶ 43, 13-14 ¶¶ 63-64, 15-17 ¶¶ 72-73, 20-23 ¶¶ 82-83, 24-28 ¶¶ 91-92, 29-31 ¶¶ 100-102, 32-33 ¶ 110, and 34-35 ¶ 116.

[106] *Id.* at 7-8 ¶¶ 35-37, 9-10 ¶¶ 41-43, 12-14 ¶¶ 61-64, 14-17 ¶¶ 70-73, 19-23 ¶¶ 80-83, 23-28 ¶¶ 89-92, 29-31 ¶¶ 98-102, 32-33 ¶¶ 108-110, and 34-35 ¶¶ 114-116.

[107] *Id.* at 18-19 ¶ 74.

[108] *Id.* at 38 ¶¶ 129, 132.

employed by Plaintiffs, they were not authorized to use personal, external thumb drives to download and *copy* this information and then take it to a competitor."[109]  Plaintiffs elaborate, stating that Defendants "were never authorized, according to the technology policies to use external devices to *copy* information, and if they did, because they were disconnected from Plaintiffs' network, they had to immediately synchronize the information with Plaintiffs' databases."[110]

In support of their position, Defendants cite to *Packaging Corporation of America, Inc. v. Croner*, 419 F.Supp.3d 1059 (N.D. Ill. 2020).  In *Croner*, the court found that the plaintiff did not plausibly allege misappropriation under the DTSA because "[t]he complaint itself makes plain that rather than acquiring the alleged trade secrets by improper means, [the defendant] acquired them through the normal course of his employment."  419 F.Supp.3d at 1066.  The defendant was paid by the plaintiff "to acquire, accumulate, and assemble over years" the confidential information and trade secrets at issue there.  *Id.*  The court found that even if the defendant did not return the information, as alleged by the plaintiff, "the failure to return lawfully acquired information does not constitute 'misappropriation' of that information under the DTSA."  *Id.*

This case, however, is not controlling here, not only because it is non-precedential, but also because there are no allegations here that Defendants' jobs were to acquire, accumulate, and assemble the information at issue here.  Rather, the allegations here, unlike those in *Croner*, are that Defendants, while given access to the information in the course of their employment with Plaintiffs, improperly copied such information onto personal devices and/or sent it to personal email addresses, in violation of company policies and procedures.  Thus, the Court not only finds *Croner* inapposite, but also finds Plaintiffs' allegations qualify as misappropriation by acquisition

---

[109] R. Doc. 43 at 18 (emphasis in original).
[110] *Id.* (citing R. Doc. 24-3 at 2 (emphasis in original).

under the DTSA. *See Volt Power*, 2022 WL 70125, at *4 (allegations that defendant uploaded trade secrets "to a personal USB drive" and that competing company's receipt of the proprietary information that it knew was wrongly acquired were sufficient to state a claim for misappropriation under the DTSA); *Schehr*, 2017 WL 3721543, at *5 (assertions that defendant "copied trade secrets from his company-issued laptop onto external hard drives" and "emailed confidential and proprietary files on [plaintiff's] computer network to his personal email account," supported by forensic analysis, state a claim for misappropriation by acquisition).

Because the Court has found that Plaintiffs have sufficiently stated a claim for misappropriation of trade secrets under the DTSA through acquisition of the information through improper means, the Court need not here discuss the sufficiency of Plaintiffs' arguments as to disclosure or use of the information, the alternative means of misappropriation under the DTSA.

### 3.    Relation of Trade Secret to Commerce

The next requirement for a claim under the DTSA is that the trade secret be "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Defendants do not challenge this in their Motion to Dismiss. Plaintiffs, in their Amended Complaint, allege that their trade secrets are related to products or services in interstate commerce,[111] and nothing in the record belies this assertion.

### 4.    Whether Brown & Root is the Owner of Any Trade Secrets

Finally, to state a claim under the DTSA, Plaintiffs must also allege they own a trade secret. *See Am. Biocarbon*, 2020 WL 7264459, at *3. In their Motion to Dismiss, Defendants argue that BRIS cannot be the owner of any trade secrets. As defined in the DTSA, an "owner, with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title

---

[111] R. Doc. 24 at 38 ¶ 128, 39 ¶ 136.

to, or license in, the trade secret is reposed."  18 U.S.C. § 1839(4).  Defendants allege that BRIS "is not licensed to provide engineering services in Louisiana" and that, as such, it "has no rightful legal or equitable right to claim ownership of any engineering related trade secrets for which it is not authorized to provide in Louisiana."[112]  However, Defendants provide no statutory or case-law support for this assertion and point to no language in the DTSA requiring a license by a state board for ownership of a trade secret.  This is, at best, a misinterpretation of the word "license" in the DTSA.  Regardless, the Court finds it without merit.  BRIS is the parent company of BRIS Engineering; to the extent certain trade secrets may be individually owned by either company, that is a question of fact for a jury.  As such, the Court finds that Plaintiffs have sufficiently stated a claim for misappropriation of trade secrets in violation of the DTSA.

## B.     Conspiracy to Misappropriate Trade Secrets

In their Motion to Dismiss, Defendants also seek dismissal of Plaintiffs' claim of conspiracy to misappropriate trade secrets under the DTSA.[113]  However, they do so only in a footnote that states, in its entirety: "Defendants request dismissal of the redundant 'Conspiracy to Misappropriate Trade Secrets Under the Defend Trade Secrets Act' claim included as the Second Cause of Action in the Amended Complaint (¶¶ 135-140).  The conclusory allegations of this conspiracy claim should not be accepted and, furthermore, no factual allegations support the existence of any 'conspiracy.'"[114]  No other information or argument is provided.  As the Court has found that Plaintiffs sufficiently have stated a claim for violation of the DTSA by several former employees, all of whom subsequently joined the same competitor, and as Defendants have

---

[112] R. Doc. 39 at 15, 16.
[113] *See* R. Doc. 24 at 39-40 ¶¶ 135-140.
[114] R. Doc. 39 at 13 n. 1.

failed to make a single argument as to how Plaintiffs have failed to state a viable claim for relief, the Court will deny Defendants' footnote-only request to dismiss this claim of Plaintiffs.

### C. Supplemental Jurisdiction Over State Law Claims

Defendants' next request in their Motion to Dismiss is that, to the extent the DTSA claims are dismissed, the Court decline to exercise supplemental jurisdiction over the remaining state law claims.[115] However, as the Court is not dismissing any of Plaintiffs' DTSA claims, this request is not applicable and is denied.

### D. Abstention Pursuant to *Colorado River* Doctrine

Finally, Defendants claim that "[t]o the extent the DTSA claim is not dismissed, the Court should dismiss or stay this proceeding under the abstention doctrine recognized by the Supreme Court in *Colorado River v. United States*, 424 U.S. 800, 817 (1976)."[116] Known as the *Colorado River* abstention doctrine, it "applies when suits are parallel, having the same parties and the same issues." *Stewart v. W. Heritage Ins. Co.*, 438 F.3d 488, 491 (5th Cir. 2006) (citation omitted). However, "a district court may abstain from a case only under 'exceptional circumstances.'" *Id.* (quoting *Colorado River*, 424 U.S. at 813) (describing abstention as "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it"). In determining whether "exceptional circumstances" exist, the Supreme Court identified the following six relevant factors:

> 1) assumption by either court of jurisdiction over a res, 2) relative inconvenience of the forums, 3) avoidance of piecemeal litigation, 4) the order in which jurisdiction was obtained by the concurrent forums, 5) to what extent federal law provides the rules of decision on the merits, and 6) the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

---

[115] *Id.* at 20.
[116] *Id.* at 22.

*Id.* (citing *Kelly Inv., Inc. v. Cont'l Common Corp.*, 315 F.3d 494, 497 (5th Cir. 2002). These factors must be carefully balanced, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.* at 492 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)); *see also Morris v. SWDI, LLC*, 872 F.Supp.2d 499, 508 (E.D. La. 2012) ("the standard for abstention is very high").

### 1.    Whether the Federal and State Proceedings are Parallel

"[B]efore even considering whether to abstain, the Court must first satisfy itself that the state and federal proceedings are parallel, as the federal court must exercise jurisdiction if the suits are not." *Morris*, 872 F.Supp.2d at 508 (citing *Hartford Accident & Indem. Co. v. Costa Lines Cargo Servs., Inc.*, 903 F.2d 352, 360 (5th Cir. 1990); *RepublicBank Dallas, N.A. v. McIntosh*, 828 F.2d 1120, 1121 (5th Cir. 1987)). Therefore, whether the federal and state court actions are "parallel" is the "threshold issue." *Bowers v. Walmart Stores, Inc.*, No. 16-12127, 2016 WL 6600008, at *4 (E.D. La. Nov. 8, 2016) (citation omitted).

Cases are parallel when they "involve the same parties and substantially identical claims, raising nearly identical allegations and issues." *Id.* (citation and internal quotations omitted). However, "the identity of the parties is not determinative." *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017) (citing *Afr. Methodist Episcopal Church v. Lucien*, 756 F.3d 788, 797 (5th Cir. 2014)). "Instead, a court may 'look both to the named parties and to the substance of the claims asserted' to determine whether the state proceeding would be dispositive of a concurrent federal proceeding." *Id.* (quoting *Afr. Methodist Episcopal Church*, 756 F.3d at 797).

Turning first to the parties, both the state and federal actions include the same Plaintiffs and the same Defendants, with the exception of D. Farris and M. Farris, who are not named as

defendants in the state case. However, whether the claims essentially are the same is a closer call. The state case contains breach of contract claims that are not raised in the federal case, while the federal case contains conspiracy claims not alleged in the state action. Additionally, Plaintiffs bring a claim for unjust enrichment against Fides in the instant litigation, but not in the state case. The cases, though, likely will turn on the same evidence and same facts. Thus, while it is likely that the cases are sufficiently parallel, it is not crystal clear. However, the Court need not make a decision on this issue here. Should it find the cases not parallel, it must exercise jurisdiction. And should it find that although the cases are parallel, exceptional circumstances do not exist to warrant abstention, it must exercise jurisdiction—two means to reach the same end. As discussed below, the Court finds that there are no exceptional circumstances here to warrant abstention in the instant litigation under the *Colorado River* abstention doctrine. Thus, the Court should not abstain in this matter.

### 2.    Whether Exceptional Circumstances Exist

As conceded by Defendants in their Motion to Dismiss, factors one, two, and six "are either neutral and/or weigh against abstention."[117] Per Defendants, neither court has assumed jurisdiction over a *res*, neither forum is inconvenient, and the state action "should give Brown & Root adequate protection such that this factor is neutral."[118] Despite this assertion by Defendants, the Court considers each factor, in turn, below.

### a.    Jurisdiction over a res

Regarding the first factor, the Parties agree that neither court has jurisdiction over a *res*.[119] "Fifth Circuit law clearly dictates that 'the absence of this factor weighs against abstention.'"

---

[117] R. Doc. 39 at 26.
[118] *Id.*
[119] R. Doc. 39 at 26; R. Doc. 43 at 28.

*Morris*, 872 F.Supp.2d at 509 (quoting *Murphy v. Uncle Ben's Inc.*, 168 F.3d 734, 738 (5th Cir. 1999)).  Following Fifth Circuit precedent, this factor weighs against abstention here.

### b.    Relative inconvenience of forums

The second factor to consider is the relative inconvenience of the forums.  Here, both forums are equal in terms of convenience, as both the Middle District of Louisiana and the Nineteenth Judicial District of Louisiana are both located in Baton Rouge, Louisiana.  This factor also weighs against abstention.  *Id.* (finding this factor weighs against abstention where "two proximate and similar courthouses in southeastern Louisiana make neither forum more or less convenient than the other").

### c.    Avoidance of piecemeal litigation

Piecemeal litigation can exist when there is more than one plaintiff, one defendant, and one issue.  *Id.* (citing *Murphy*, 168 F.3d at 738).  Defendants argue that the risk of inconsistent rulings is "highly likely" here because, while "many of the same parties have been named in each lawsuit, Plaintiffs did not name two defendants in this federal proceeding, Michael Farris and Daniel Farris, in the State Action."[120]  Defendants further note that the state case "includes breach of contract claims against Andy Farris and Steed that are not included in this federal action."[121]

The Fifth Circuit has made clear that "the prevention of duplicative litigation is not a factor to be considered in an abstention determination."  *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 650 (5th Cir. 2000) (quoting *Evanston Ins. Co. v. Jimco, Inc.*, 844 F.2d 1185, 1192 (5th Cir. 1988)) (modification omitted).  "The real concern at the heart of the third *Colorado River* factor is the avoidance of *piecemeal* litigation and the concomitant danger of inconsistent rulings with respect to a piece of property."  *Id.* at 650-51 (citing *Evanston*, 844 F.2d at 1192).  "When, as

---

[120] R. Doc. 39 at 26.
[121] *Id.* at 26-27.

here, no court has assumed jurisdiction over a disputed res, there is no such danger." *Id.* (citing *Evanston*, 844 F.2d at 1192); *see also Morris*, 872 F.Supp.2d at 509 ("Furthermore, the Fifth Circuit has determined that the avoidance of piecemeal litigation does not weigh in favor of abstention when a case does not involve jurisdiction over a res or property, such that there is no danger of inconsistent rulings affecting property ownership.") (internal quotations omitted). As, admittedly, there is no jurisdiction over a res, the Court finds this factor weighs against abstention. *See Black Sea Inv.*, 204 F.3d at 651; *see also Evanston*, 844 F.2d at 1192.

### d.    The Order in which jurisdiction was obtained

The next factor to consider is the order in which jurisdiction was obtained by the concurrent forums. However "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Morris*, 872 F.Supp.2d at 510 (quoting *Murphy*, 168 F.3d at 738). Here, while it is clear that the action in state court was filed first, the parties dispute the characterization of the progress made in state court. In supplemental briefing to this Court on this particular issue, Defendants assert that "ongoing and intensive discovery efforts" are proceeding in state court, including seven sets of written discovery requests being issued by Plaintiffs in the state court proceeding in December 2021, after the conclusion of briefing in this Court on the instant Motion to Dismiss.[122]  Plaintiffs also have requested dates for depositions of certain third-parties.[123]  Defendants point out that, contrary to this, a Rule 26(f) Conference has not been held in the current federal case, having been delayed pending resolution of the instant Motion to Dismiss.[124]

---

[122] R. Doc. 47 at 1, 2-3.
[123] *Id.* at 3-4.
[124] *Id.* at 3.

Plaintiffs, however, characterize the state court action as having "been tied up in procedural and preliminary posturing, with the Defendants yet to file an Answer."[125]  Plaintiffs continue that they "have admittedly engaged in discovery in the state court proceeding as the matter has not been stayed," but also note that "[t]he parties though have stipulated that any depositions set after December 30, 2021, will be taken for the purposes of the Middle District case as well."[126]  Thus, per Plaintiffs, "much of the discovery needed for the federal court action is also currently being obtained."[127]

As this case has not proceeded beyond the Motion to Dismiss stage, the Court finds that, as more progress has been made in the state court litigation, this factor weighs in favor of abstention.  However, this factor alone cannot provide the basis for abstention.  *Barnett v. La. Dep't of Health*, No. 17-1793, 2019 WL 1264881, at *10 (M.D. La. Mar. 19, 2019) (rejecting defendant's suggestion that this factor alone provides the basis for abstention and noting that defendant "has pointed the Court to no authority holding that the fourth factor can outweigh each other factor where, as here, the rest weigh strongly against abstention").

### e.    The presence or absence of a federal question

The Court turns next to whether a federal question exists in this litigation and finds it does. According to Defendants, "[t]hough the existence of the DTSA claim is a consideration that may weigh against the surrender of jurisdiction, should this claim fall, this factor should weigh easily in favor of abstention …"[128]  This claim, however, has not fallen, meaning questions of federal law remain in this case.  "The presence of a federal law issue must always be a major consideration weighing against surrender of jurisdiction, but the presence of state law issues weighs in favor of

---

[125] R. Doc. 51 at 3.
[126] *Id.* (internal quotations omitted).
[127] *Id.* at 3-4.
[128] R. Doc. 39 at 28.

surrender only in rare circumstances." *Murphy*, 168 F.3d at 739 (quoting *Evanston*, 844 F.2d at 1193) (internal quotations and modification omitted).   As such, this factor weighs against abstention.

### f.    Adequacy of protection offered by state court

The final factor to consider is the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.  According to the Supreme Court, "[w]hen a district court decides to dismiss to stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties" and that "[i]f there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all."  *Moses H. Cone*, 460 U.S. at 28 (citations omitted).  Further, this factor "can only be 'a neutral factor or one that weighs against, not for, abstention.'"  *Murphy*, 168 F.3d at 739 (quoting *Evanston*, 844 F.2d at 1193).

As argued by Defendants, Plaintiffs have "adequate protection in the State Action to address any alleged misappropriation of 'trade secrets' as Plaintiffs filed the same LUTSA [Louisiana Uniform Trade Secrets Act] claim in the State Action that is also pending in this case."[129]  Plaintiffs disagree, arguing that their claims "against A. Farris, Steed, Brown, D. Farris, M. Farris, Hebert, Huval, Morgan, and Sterken for violation of the DTSA including conspiracy and breach of fiduciary duty will not be adequately protected by the state court action."[130]  The Court notes that Plaintiffs bring conspiracy claims, an unjust enrichment claim, and additional breach of fiduciary duty claims in their federal case.  While the claims brought in the two actions are, admittedly, very similar, the Court finds this factor weighs slightly against abstention.

---

[129] R. Doc. 39 at 29.
[130] R. Doc. 43 at 30.

Thus, for the majority of factors, the facts and law weigh in favor of this Court exercising jurisdiction over this matter. Of the six *Colorado River* abstention factors, only one—the order in which jurisdiction was obtained—favors abstention. As previously stated, this factor alone cannot outweigh all the other factors. *See Barnett*, 2019 WL 1264881 at *10. Considering that the Court's starting point is "heavily weighted in favor of the exercise of jurisdiction," *Stewart*, 438 F.3d at 492, the Court's analysis of the six factors does not tip the scale in favor of abstention. Defendants have failed to show that the extraordinary circumstances required for abstention pursuant to the *Colorado River* doctrine are present here.

V.     **CONCLUSION**

For the foregoing reasons,

**IT IS RECOMMENDED** that Defendants' Motion to Dismiss (R. Doc. 35) be **DENIED**.

Signed in Baton Rouge, Louisiana, on September 9, 2022.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**